**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**TIA YOUNG,**

     **Plaintiff,**

**v.**                                                    **CASE NO. 3:09-cv-01062**

**MICHAEL J. ASTRUE,
Commissioner of the Social
Security Administration,**

     **Defendant.**

## MEMORANDUM OPINION

This is an action seeking review of the decision of the Commissioner of Social Security (hereinafter the "Commissioner") denying Claimant's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. (Docket No. 1). Both parties have consented in writing to a decision by the United States Magistrate Judge. (Docket Nos. 5 and 6). The case is presently pending before the Court on the parties' cross motions for judgment on the pleadings as articulated in their briefs. (Docket Nos. 11 and 15).

## I.   Procedural History

Plaintiff, Tia Young (hereinafter "Claimant"), filed applications for DIB and SSI on May 8, 2007, alleging disability beginning January 1, 2006 due to "back; wrist; carpal tunnel; herniated discs and knee problems; and emotional problems." (Tr. at 114, 122, 158).  The claims were denied initially on October 12, 2007 and upon reconsideration on January 8, 2008.   (Tr. at 10). Thereafter, Claimant

requested an administrative hearing. (*Id.*). The video hearing was held on December 1, 2008 before the Honorable Robert S. Habermann, Administrative Law Judge (hereinafter the "ALJ). (Tr. at 23-47). By decision dated March 10, 2009, the ALJ determined that Claimant was not under a disability as defined by the Social Security Act. (Tr. at 10-22).

The ALJ's decision became the final decision of the Commissioner on August 21, 2009 when the Appeals Council denied Claimant's request for review. (Tr. at 1-3). ). On September 30, 2009, Claimant brought the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Docket No. 2). The Commissioner has filed an Answer and a Transcript of the Administrative Proceedings, and both parties have filed their Briefs in Support of Judgment on the Pleadings. (Docket Nos. 9, 10, 11 and 15). The matter is, therefore, ripe for resolution.

## II.   Summary of Findings by the ALJ

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. See *Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied.  20 C.F.R. §§404.1520, 416.920.  The first step in the sequence is

determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§404.1520(c), 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. *Id.* §§404.1520(d), 416.920(d). If the impairment does, then the claimant is found disabled and awarded benefits. However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity, which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§404.1520(e), 416.920(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to prove, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* §§404.1520(g), 416.920(g); See also, *McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in

significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review." 20 C.F.R. § 404.1520a. First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the SSA compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. 20 C.F.R. § 404.1520a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. 20 C.F.R. § 404.1520a(d)(3).

- 4 -

In this particular case, the ALJ found that Claimant met the insured status requirements for DIB through December 31, 2011 and had not engaged in substantial gainful activity since the alleged disability onset date; thereby, fulfilling the first step of the sequential evaluation.  (Tr. at 12, Finding Nos. 1 and 2).  At the second step of the analysis, the ALJ concluded that Claimant had severe impairments of "pain, carpal tunnel, headaches, shortness of breath, depression, fatigue, and motor vehicle accident history." (Tr. at 12, Finding No. 3).  At the third step of the evaluation, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 12-18, Finding No. 4).

The ALJ then found that Claimant had the residual functional capacity ("RFC") to "perform the full range of sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) except with the following limitations:" (Tr. at 18, Finding No. 5).   However, the ALJ failed to delineate the additional limitations. The ALJ concluded that Claimant could return to her past relevant work as "a hair dresser, food demonstrator, fast food worker" and was also capable of performing "other sedentary work." (Tr. at 21-22, Finding No. 6).  Relying upon the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs such as machine tender, document handler, and product inspector, all of which existed in significant numbers in the national and regional economy. (*Id*).   Accordingly, Claimant was not under a disability as defined by the Social Security Act and was not entitled to benefits.  (Tr. at 22).

### III.    Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying Claimant's applications for benefits is supported by substantial evidence. In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" as the following:

> Evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972), quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).  Consequently, the decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F. 3d 650,653 (4th Cir. 2005), citing *Craig v. Chater,* 76 F.3d585, 589 (4th Cir. 2001).

Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court will not re-weigh conflicting evidence or substitute its judgment for that of the Commissioner. *Id.* Nevertheless, the Court must not "escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). The ultimate question for the Court is whether the decision of the Commissioner is well-grounded, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that

decision falls on the [Commissioner]." *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987).

A careful review of the record in this case reveals that the decision of the Commissioner is not supported by substantial evidence.

## IV.    <u>Claimant's Background</u>

Claimant was 33 years old at the time of the administrative hearing. (Tr. at 26). She completed the ninth grade at school and subsequently tried to obtain her GED, but did not pass the test.  (Tr. at 27). Claimant could speak and read English. (Tr. at 27).  In the past, she had worked as a cashier at Long John Silver's, as a hair dresser, and as a food demonstrator at Sam's Club.  (Tr. at 32-33).

## V.    <u>The Relevant Medical Records</u>

Claimant complained of pain in her wrists, back, and knees and of "emotional problems."

### A.    **Shoulder, Wrist and Arm Symptoms**

On February 6, 2004, Claimant presented to an urgent care center complaining of left shoulder pain and irritation in her left arm with decreased circulation.  (Tr. at 415).  She told the examining physician, Dr. B. Bower, that she worked as a hairdresser and had been extremely busy.  (*Id.*).  Dr. Bower diagnosed Claimant with left shoulder strain and resulting tendonitis.  He provided her with a brace to immobilize the joint and encouraged her to let it rest over the weekend. He gave her some samples of Bextra and told her to return if her symptoms did not improve.  (*Id.*).  Claimant returned to the urgent care center four days later complaining of residual pain.  (Tr. at 416-417).  On examination, her range of motion was normal, and she showed no signs of nerve impingement.  However,

- 7 -

her shoulder was tender along the left trapezius and left deltoid muscles.  (*Id.*).
Claimant was diagnosed with left shoulder strain and trapezius strain.  She was
given prescriptions for Flexeril, Ibuprofen 800 mg., and Darvocet-N 100 and was
told to continue applying heat and stretching.  (*Id.*).  The examining physician, Dr.
Daniel Whitmore, instructed Claimant to take the next three days off from work
and to return to his office in one month.  (*Id.*).

   In September 2004, Claimant began treating with Dr. Stanley Tao, an
orthopedic surgeon with Scott Orthopedic in Huntington.  Claimant told Dr. Tao
that she had right arm and wrist pain that began on August 27, 2004.  According to
Claimant, she was cleaning when she experienced pain in her right arm with
numbness and tingling in her fingers.  (Tr. at 271-272).  Dr. Tao diagnosed right
trapezius pain, right cubital tunnel syndrome and possible right carpal tunnel
syndrome.[1]  (*Id.*).  He provided Claimant with a night splint, prescribed Bextra 10
mg., and recommended a nerve conduction study of Claimant's right upper
extremity.  (*Id.*).  Claimant continued to see Dr. Tao every two or three weeks until
May 18, 2005 (Tr. at 322-328).  During this time period, Dr. Tao confirmed the
existence of severe right cubital tunnel syndrome by nerve conduction studies and
recommended that Claimant undergo a right carpal and cubital tunnel release with
possible transposition.  (Tr. at 322-323).

   On May 18, 2005, upon a referral by Dr. Tao, Claimant consulted with Dr.
Earl Foster, also an orthopedic surgeon at Scott Orthopedic.  (Tr. at 320-321).

---

[1] Cubital tunnel syndrome is caused by compression or entrapment of the ulner nerve in the elbow,
which results in pain, swelling and weakness in the arm, hand and fingers.  Carpal tunnel syndrome
has similar symptoms, but is caused by compression or entrapment of the median nerve.
**American Academy of Orthopaedic Surgeons, 2007.**

Claimant advised Dr. Foster that she had an eight month history of numbness in the ring and little finger of her left hand and numbness involving all five digits of her right hand. (*Id.*). She had no other orthopedic or neurological complaints. Dr. Foster examined Claimant and diagnosed bilateral cubital tunnel syndrome and right carpal tunnel syndrome. (*Id.*). He recommended surgical intervention, to which Claimant consented. On June 9, 2005, Dr. Foster performed a surgical release of the ulner nerve *in situ* and right elbow and endoscopic carpal tunnel release. (Tr. at 304-305). Claimant progressed well after the procedure, with a full range of motion of her right elbow, wrist, and hand. (Tr. at 315). However, shortly thereafter, she began to develop similar symptoms on the left side. (*Id.*). Therefore, on August 31, 2005, Claimant underwent a nerve conduction study to determine if she had developed cubital and/or carpal tunnel syndrome on the left side. The study showed no nerve conduction abnormalities. (Tr. at 316-318).

### B.   Back Symptoms

On October 3, 2005, Claimant was involved in a motor vehicle accident that triggered her back symptoms. (Tr. at 347-349). Claimant was taken to the Cabell Huntington Hospital Emergency Room, where she described the accident, indicating that her seatbelt had given away, allowing her chest to strike the dashboard and her head to hit the windshield. She lost consciousness for an undetermined period of time. (*Id.*). Claimant was admitted to Cabell Huntington Hospital as a trauma patient and was discharged after observation.

On October 20, 2005, Claimant consulted with Lura-Beth Hensley, a chiropractor in Chesapeake, Ohio. (Tr. at 351-354). In her registration form, Claimant stated that she had constant pain in her back, arm and neck. (*Id.*). She

described it as sharp, burning, tingling, throbbing, and aching with numbness. She indicated that the pain had started at the time of the accident and had gotten progressively worse. (*Id.*). Dr. Hensley ordered an MRI of Claimant's lumbar spine, which was completed on November 1, 2005. (Tr. at 364). The study revealed a central/right paracentral small L3-4 subligamentous disc herniation; a focal bulge or protrusion of the annulus centrally at L4; and a small subligamentous L5-S1 central disc herniation. (*Id.*). An MRI study of Claimant's cervical spine taken on November 16, 2005 was normal with no evidence of disc disease or canal narrowing. (Tr. At 369).

Claimant saw Dr. Hensley seven times in November 2005. (Tr. at 385- 390, 464-466). On each visit, Dr. Hensley documented that Claimant had complaints of pain in her lower back that she described as frequent and of moderate intensity. (*Id.*). In addition, Claimant reported frequent sharp, shooting and throbbing pain in her neck on the right side. (Tr. at 463). Dr. Hensley provided manipulation of the spine, as well as cryotherapy and interferential stimulation. (*Id.*).

During the month of December 2005, Claimant saw Dr. Hensley another five times, still complaining of low back and neck pain with intermittent numbness, stiffness and soreness. (Tr. at 459- 463). On December 12, 2005, Claimant was evaluated by Dr. David Weinsweig, a neurosurgeon, at the request of Dr. Hensley. (Tr. at 419-420). Dr. Weinsweig documented that Claimant had experienced pain in her lower back ever since her involvement in a motor vehicle accident on October 5, 2005. Claimant described the pain as a "burning discomfort" that traveled down both legs, with the right being worse than the left. She also had tingling and numbness in her right foot. (*Id.*). Dr. Weinsweig

- 10 -

reviewed the prior films and opined that Claimant's pain was "somewhat out of proportion to the MRI findings." (*Id.*). He did not recommend surgery at that time, but suggested a referral to a pain clinic along with continued chiropractic care. He also ordered a bone scan, lumbar x-rays, and nerve conduction studies of the lower extremities. (*Id.*).

Dr. Hensley continued to treat Claimant for her neck and back pain in 2006. (Tr. at 445-458). On January 19, 2006, Claimant underwent nerve conduction studies and needle electromyography studies performed by Dr. Carl McComas, a neurologist, at the request of Dr. Weinsweig. (Tr. at 436-437). Dr. McComas reported these studies as normal. (Id.). In February 2006, Claimant also had a bone scan, which was normal except for focal activity within the distal left femur. (Tr. at 433). Despite minimal findings on these studies, Dr. Hensley noted that Claimant's symptoms were not improving and that she had developed additional symptoms, including frequent shooting and throbbing pain, with increased numbness in her legs that had caused her to fall down steps. (Tr. at 452-454). Over the next three months, Claimant persisted in her complaints of pain, with no obvious improvement from Dr. Hensley's care. (Tr. at 445-451).

On July 14, 2006, Claimant had a follow-up MRI of her lumbar spine ordered by Dr. Weinsweig. The radiologist's impression was disc protrusion from L3 through S1 with mild narrowing of the spinal canal at L3-L4. (Tr. at 425-426). These findings were confirmed on March 22, 2007, when an MRI of Claimant's lumbar spine ordered by Dr. Hensley demonstrated multilevel degenerative disc disease with stable disc herniations from L3-4 through L5/S1 without significant change. (Tr. at 427-428).

At a follow-up visit with Dr. Weinsweig on April 30, 2007, Claimant reported that she was "miserable with pain," primarily from the right buttock, down her leg all the way to her foot, which had diffuse numbness and tingling. (Tr. at 442-443). Dr. Weinsweig reiterated that Claimant's MRI showed multilevel bulging disks "but nothing serious." (*Id.*). He did not recommend surgical intervention, although Claimant wanted to proceed with surgery. He suggested a pain clinic, prescribed Neurontin and ordered a lumbar myelogram to better delineate if "there is pathology that can be helped by surgery." (*Id.*). The lumbar myelogram was completed on August 23, 2007 and documented the existence of disc bulging "most pronounced at the L3-4 level where there is mild to moderate, closer to mild, acquired spinal canal stenosis." No instability was noted. (Tr. at 734). The myelogram was followed with a CT scan of the lumbosacral spine with contrast. This study revealed multilevel degenerative disc bulges, most pronounced at the L3-4 with minimal spinal canal stenosis and mild to moderate right and moderate left-sided neural foraminal stenosis without clear-cut L3 nerve root impingement or focal disc herniation. (Tr. at 704-705).

Another MRI of Claimant's cervical spine was completed on September 30, 2008 at the request of Dr. Hensley. The report reflected a stable examination with minimal degenerative change and disc disease. (Tr. at 758). Some very minimal right-sided C4-5 and C5-6 neural foraminal narrowing, mainly secondary to uncovertebral spurring, was also noted. (*Id.*). An MRI of a Claimant's thoracic spine performed on the same day was reported as negative. (Tr. at 759).

On November 17, 2008, Dr. Weinsweig performed a left L2-L3 microdiskectomy for lumbar radiculopathy. (Tr. at 761-762). Prior to performing

the procedure, Dr. Weinsweig discussed alternatives to surgery, but Claimant indicated that she was "fed up" living with pain and wanted the operation.  (Tr. at 763-764).  Dr. Weinsweig noted that Claimant's pain had become chronic.  (*Id.*).

### C.    Knee Pain and Psychiatric Symptoms

The medical records in evidence contain only a few notations regarding knee pain and no entries reflecting psychiatric evaluation, treatment, referral or hospitalization.   On February 8, 2006, Dr. Weinsweig ordered an x-ray of Claimant's left patella in follow-up to the finding on her bone scan.  (Tr. a 432).  The film revealed a dense/sclerotic abnormality, with no expansion of bone or lytic component.   (Tr. at 216).   Later, in June 2006, Claimant complained to Dr. Hensley that her left knee was painful and swollen.  (Tr. at 446).  However, no other testing appears in the record.

### D.    SSA Evaluations

On August 30, 2007, Dr. Roger C. Baisas, a neurosurgeon and disability evaluator, performed a medical assessment of Claimant at the request of the SSA.  (Tr. at 673-680).  Claimant advised Dr. Baisas that she suffered from carpal tunnel syndrome and had undergone surgical release on the right side in July 2005.  She indicated that she had no improvement from the surgery and was considering a "redo." (*Id.*).  She also complained of low back pain and knee pain.  She stated that she stayed depressed because of these problems.  (*Id.*).  Dr. Baisas performed an examination and concluded that Claimant had lumbosacral radiculitis; carpal tunnel syndrome; polyarticular degenerative arthritis; and mental depression.  (*Id.*).   He felt Claimant's prognosis was fair.

- 13 -

Dr. Fulvio Franyutti completed a Physical Residual Functional Capacity Assessment based upon Dr. Biasas' evaluation, the medical records, and Claimant's disability report.   (Tr. at 681-688).  He determined that Claimant had some exertional and postural limitations; was limited in her ability to feel with her right hand; had no visual or communicative limitations; and should avoid concentrated exposure to extreme cold, vibrations, and hazards.  (*Id.*).  Dr. Franyutti felt that Claimant was only partially credible in her complaints, because her activities of daily living were reportedly more restricted than indicated by her medical examination.  (*Id.*).

Because of Claimant's allegation of "emotional difficulties," the SSA arranged a psychological evaluation of Claimant with Cherie Zeigler, M.A., of Accord Psychological Services, to take place on October 1, 2007.  (Tr. at 707-712).  Claimant appeared at the stated time for the evaluation.  She reported to Ms. Ziegler that she had stopped working in 2004 after hurting her back and arms at work.  She had no history of mental health treatment, although she had "bad nerves" and "extreme mood swings."  (*Id.*).  Ms. Ziegler conducted a mental status evaluation, which revealed mild to moderate deficiencies in memory, concentration, pace and persistence, and social functioning.  (*Id.*).  Ms. Ziegler diagnosed Anxiety Disorder, Not Otherwise Specified, by History; Mood Disorder with depressive features due to chronic back pain and carpal and cubital tunnel; and Parent-child relational problem.  (*Id.*).  She opined that Claimant's prognosis was poor.

James W. Bartee, Ph.D., then completed a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment. (Tr. At 713-730)  Dr. Bartee

found that Claimant had a 12.04 affective disorder and a 12.06 anxiety-related disorder.  He estimated her degree of functional limitation in activities of daily living to be mild and to be moderate in social functioning, concentration, persistence, and pace.  Claimant had no episodes of decompensation.  Dr. Bartee determined that Claimant's functional and adaptive limitations resulted in a severe mental impairment, which did not meet a listed impairment.  He concluded that she "retained sufficient mental capacity to perform simple 1-2 step routine and repetitive work-like activities in a low demand/pressure setting with limited expectations for social interactions with coworkers, supervisors or the general public.  (*Id.*).

A second Physical Residual Functional Capacity Evaluation was completed by Dr. Uma Reddy on January 8, 2008.  (Tr. At 736-743).  Dr. Reddy found Claimant to have exertional and postural limitations, as well as manipulative limitations in handling, fingering, and feeling.  (*Id.*).  She had no visual or communicative limitations.  Dr. Reddy indicated that Claimant should avoid concentrated exposure to extreme cold, extreme heat, vibration and moderate exposure to hazards. (*Id.*). Dr. Reddy assessed Claimant as only partially credible, because her complaints of pain and purported limitations were exaggerated when compared to her physical findings and use of over-the-counter medications.  (*Id.*).

Dr. H.C. Alexander, III responded to an interrogatory for medical opinion on February 16, 2009 and supplied a Medical Source Statement of Ability to do Work-Related Activities (Physical) on the following day.  (Tr. At 768-776).  Dr. Alexander found that Claimant could lift and carry up to 10 pounds frequently and up to 20 pounds occasionally.  She could sit up to six hours in an eight hour

workday; stand four out of eight hours; and walk three hours in an eight hour workday.  (*Id.*).  Dr. Alexander further found that Claimant was restricted in her ability to use her hands and her legs, but was generally able to manage activities of daily life.  (*Id.*).

## VI.  <u>Claimant's Challenges to the Commissioner</u>

Claimant raises three alleged errors by the ALJ that Claimant contends entitles her to judgment on the pleadings, or in the alternative, to a remand for further proceedings.  First, Claimant argues that the ALJ's RFC was faulty, because he failed to complete it.  (Pl. Br. at 10).  Moreover, he compounded this error by finding that Claimant could perform her past relevant work when all of the evidence, including the testimony of the vocational expert, was to the contrary.  (*Id.*).  Second, Claimant asserts that the ALJ failed to fully consider the impact of her combined impairments on her ability to work.  (Pl. Br. at 10-12).  Finally, Claimant takes issue with the ALJ's analysis of Claimant's pain and psychiatric symptoms.  According to Claimant, the objective medical evidence substantiates her subjective complaints; therefore, her testimony should have been given greater weight by the ALJ.  (Tr. at 11-12).

In response, the Commissioner concedes that the ALJ erred at step four of the sequential evaluation by concluding that Claimant could perform her past relevant work.  Nonetheless, the Commissioner argues that this error was harmless, because the ALJ properly proceeded to the fifth step and found other work that Claimant could perform despite her combined limitations.  (Def. Br. at 9-10).  In addition, the Commissioner emphasizes that the hypothetical questions posed by the ALJ to the vocational expert contained all of Claimant's medically

determinable impairments; accordingly, the intent of the social security regulations was achieved. (*Id.*) Finally, the Commissioner posits, contrary to Claimant's contention, that the objective medical evidence overwhelmingly supports the ALJ's conclusion that Claimant's functional limitations are not as pervasive as she describes them to be. (Def. Br. at 11-13).

While the Commissioner may be correct that Claimant is not disabled, the Court does not find substantial evidence in this record to support that determination. The ALJ's written decision is so hopelessly inconsistent and incomplete that the Court is unable to decipher the basis for the ALJ's critical findings. Therefore, the case should be remanded for further proceedings.

## VII. <u>Analysis</u>

There are three insurmountable problems with the ALJ's decision. First, the ALJ failed to finalize his RFC. Second, the ALJ contradicted his own RFC by finding that Claimant could perform past relevant work. Third, the ALJ never presented a hypothetical question to the vocational expert that encompassed all of the uncontroverted limitations flowing from Claimant's severe impairments. Consequently, the ALJ's decision, as written, lacks substantial evidentiary support.

As Claimant accurately describes in her brief, the ALJ's RFC stops in mid-sentence. He makes a finding that Claimant is able to perform the "full range of sedentary work," except for certain limitations; however, he never articulates them. Certainly, the record provides clues as to those limitations, but the Court's role is not to augment the ALJ's written decision or infer facts underlying his analysis. Instead, the ALJ is obligated to deliver a clear and unambiguous decision that sufficiently conveys the grounds for his determination, "building an accurate

and logical bridge between the evidence and [his] conclusions." *Blakes v. Barnhart,* 331 F.3d 565, 569 (7th Cir. 2003), citing *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).   In the absence of this bridge, the Court is hard-pressed to uphold the ALJ's ultimate determination. *Id.*

The Commissioner does not directly address the deficient RFC, but generically argues that whatever mistakes the ALJ made and/or documented in the sequential evaluation, ultimately, he proceeded to the fifth step.  Consequently, the errors were harmless.  The Court does not find this argument to be persuasive.

After step three and before proceeding to step four of the sequential evaluation, the ALJ was mandated to ascertain Claimant's RFC.   20 C.F.R. §§404.1520(e), 416.920(e).   "An RFC is what an individual can still do despite his or her functional limitations and restrictions caused by his or her medically determinable physical or mental impairments."  SSR 96-9p.  Limitations may be "exertional" and "nonexertional."   Exertional limitations pertain to the physical demands of a job: sitting, walking, lifting, carrying, pushing; and pulling.   20 C.F.R. § 404.1569a(b).  Nonexertional limitations, on the other hand, pertain to work-related limitations not encompassed by the above-stated physical demands; for instance, fatigue; lack of concentration; inability to understand and follow detailed instructions; loss of function related to depression or anxiety; inability to reach, seize or hold objects; inability to stoop or crouch.  20 C.F.R. § 404.1569a(C). At the outset, an RFC should reflect a "function-by-function" assessment, based upon the relevant evidence, of an individual's "ability to perform work-related activities." SSR 96-8p; SSR 96-9p.  An initial failure to consider an individual's ability to perform specific work-related functions can be critical to the outcome of

a case.  SSR 96-8p.  The importance of an accurate and complete RFC cannot be overstated, because the claimant's RFC is the constant against which the ALJ makes findings in steps four and five of the sequential process.  At step four of the process, the RFC must not be expressed initially in terms of exertional categories, because the first consideration is whether the claimant can perform past relevant work as she actually performed it.   SSR 96-8p. An RFC that fails to include a function-by-function assessment may result in the ALJ "overlooking some of an individual's limitations or restrictions," which "could lead to an incorrect use of an exertional category" to find that an individual can perform past relevant work.   *Id.* At step five, the same error may ignore limitations or restrictions that would "narrow the ranges and types of work an individual may be able to do."   *Id.*

Here, the ALJ explicitly documented that he found the opinions of the agency consultants to be consistent with the objective evidence.  (Tr. at 21).  He confirmed that he gave "great weight to the opinions of the State agency reviewing physicians," noting that none of these experts found Claimant to be severely restricted physically or emotionally.  He concluded, "[i]n sum, the above residual functional capacity assessment is supported by Dr. Bartee and Dr. Reddy, the State agency reviewing physicians' physical and psychological assessments, Dr. Alexander's independent evaluation of the medical evidence contained in the file, and claimant's broad activities of daily living." (*Id.*)    Yet, the ALJ's RFC, as written, did not actually reflect the function-by-function assessments of the agency consultants.

A review of the opinions prepared by the agency experts demonstrates that each of these experts found nonexertional limitations that likely produced

additional functional restrictions on Claimant's ability to perform basic work activities. For example, Dr. James Bartee found Claimant to have limitations in four out of five categories of mental activity, including moderate limitations in her ability to understand and remember detailed instructions; moderate limitations in her ability to maintain regular attendance, perform activities within a schedule, be punctual, and complete a normal workday without interruptions from psychologically based symptoms; and moderate imitations in her ability to interact appropriately with the public and get along with coworkers or peers. (Tr. at 727-728). He concluded his assessment by opining, "[t]he claimant appears to retain sufficient mental capacity to perform simple 1-2 step routine and repetitive work-like activities in a low demand/pressure setting with limited expectations for social interactions with coworkers, supervisors, or the general public." (Tr. at 729). Similarly, Dr. Reddy found limitations in Claimant's postural functions, manipulative functions, and in exposure to certain environmental factors. (Tr. 739-740). Lastly, Dr. H. C. Alexander, who at the request of the ALJ completed a Medical Source Statement of Ability to do Work-Related Activities (Physical) two months after the administrative hearing, found Claimant to be limited in her ability to reach overhead and otherwise; to be prohibited from climbing ladders or scaffolds or from crawling; and to avoid moving mechanical parts and unprotected heights. (Tr. at 768-776). However, none of these limitations were included in Claimant's RFC.

In this case, the ALJ found Claimant physically able to perform a "full range" of sedentary work. (Tr. at 18). As stated, this conclusion is not supported by substantial evidence, because the ALJ did not explain how, or if, Claimant's

medically determinable nonexertional limitations impacted her ability to do a full range of sedentary work.   The record substantiates the existence of functional restrictions that logically would erode the occupational base of sedentary work, yet the ALJ ignores them in his determination.   "When there is a reduction of an individual's exertional or nonexertional capacity so that he or she is unable to perform substantially all of the occupations administratively noticed in Table No. 1, the individual will be unable to perform the full range of sedentary work."   SSR 96-9p.  This statement appears to describe Claimant's situation.  "The impact of an RFC for less than a full range of sedentary work is especially critical for individuals who have not yet attained age 50.  Since age, education, and work experience are not usually significant factors in limiting the ability of individual under 50 to make an adjustment to other work, the conclusion whether such individuals who are limited to less than the full range of sedentary work are disabled will depend primarily on the nature and extent of their functional limitations and restrictions." *Id.*   Accordingly, the ALJ's failure to incorporate the additional functional limitations or restrictions in Claimant's RFC assessment constituted a significant omission that irreparably skewed the decision-making process.[2]

   At the fourth step of the sequential evaluation, the ALJ compared his inadequate RFC finding to the functional demands of Claimant's past relevant work to determine whether she could perform her prior job duties.  In doing so, the ALJ compounded the initial flaws in his RFC by misapplying the opinions of

_____

[2] The Court need not address Claimant's argument regarding the ALJ's alleged inadequate assessment of her pain symptoms, because the inconsistencies between the stated RFC and the adopted medical source opinions, alone, render the RFC inaccurate.

the vocational expert.  (Tr. at 21).  According to the ALJ's decision, Claimant is able to perform her past relevant work as a hairdresser, fast food worker, and food demonstrator.  *Id.* That finding, however, is patently incorrect.  At the hearing, the vocational expert testified that Claimant's past relevant work as a hairdresser was classified as skilled, light to medium exertional work.  (Tr. at 42).  Her work as a food demonstrator was light, semi-skilled work, and her experience in fast food was light and unskilled work.  *Id.*  Because all of these positions required an exertional level greater than Claimant's stated RFC allowed, the vocational expert opined that Claimant was precluded from performing all past work.  (Tr. at 43). Despite this testimony, the ALJ inexplicably found that Claimant could perform her past relevant work; a finding that should have terminated the disability evaluation at the fourth step.  However, equally as inexplicable, the ALJ proceeded to the fifth and final step of the analysis.   Contrary to the Commissioner's contention, the ALJ's progression to the next step of the sequential evaluation did not rectify his prior errors; instead, it only prolonged a tainted process.  The ALJ moved forward with a flawed RFC and an overt and unresolved inconsistency in his findings.

At the fifth step of the disability evaluation, the ALJ was required to determine whether Claimant was able to make an adjustment to other work. Claimant's RFC was crucial in identifying jobs that Claimant was capable of performing and that existed in significant numbers in the economy.  As a general rule, at step five of the process, the RFC must be expressed "in terms of, or related to, the exertional categories."  SSR 96-8p.  In order to find an individual capable of performing a full range of work in a given exertional level, the individual "must be

able to perform substantially all of the exertional and nonexertional functions required in work at that level." *Id.* For that reason, it is necessary "to assess the individual's capacity to perform each of these functions in order to decide which exertional level is appropriate and whether the individual is capable of doing the full range of work contemplated by the exertional level." *Id.* When a claimant's impairments are solely exertional, the RFC "must be expressed in terms of exertional classifications of work: sedentary, light, medium, heavy, and very heavy work." *Id.* However, when the claimant has a combination of exertional and nonexertional impairments, the ALJ must evaluate to what extent the nonexertional impairments erode the occupational base of the exertional level of work that the claimant is physically able to perform.

At this step, the burden of going forward with the evidence rests with the Commissioner,[3] who must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).[4] In order to carry this burden, the Commissioner may rely upon medical-vocational guidelines listed in Appendix 2 of Subpart P of Part 404 ("grids"), "which take administrative notice of the availability of job types in the national economy for persons having certain characteristics, namely age,

---

[3] 20 C.F.R. §§404.1520(g), 416.920(g); see also, *McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983)

[4] In this case, the burden technically never shifted to the Commissioner, because the ALJ concluded that Claimant could perform past relevant work; a conclusion that was not supported by substantial evidence.

education, previous work experience, and residual functional capacity." *Grant v. Schweiker*, 699 F.2d 189, 191-192 (4th Cir. 1983); See also 20 C.F.R. § 404.1569. The grids consider only the "exertional" component of a claimant's disability in determining whether jobs exist in the national economy that the claimant can perform, however. *Id.* For that reason, when a claimant has significant nonexertional impairments or has a combination of exertional and nonexertional impairments, the grids provide only a framework to the ALJ, who must give "full individualized consideration" to the relevant facts of the claim in order to establish the existence of available jobs. *Id.* In those cases, the Commissioner must prove the availability of jobs through the expert testimony of a vocational expert. *Id.* As a corollary to this requirement, the ALJ has the right to rely upon the testimony of a vocational expert as to the availability of jobs types in the national economy that can be performed by the claimant *so long as the vocational expert's opinion is based upon proper hypothetical questions that fairly set out all of the claimant's severe impairments.* See *Walker v. Bowen,* 889 F.2d 47 (4th Cir. 1989).

It is well established that for a vocational expert's opinion to be relevant, it must be in response to a proper hypothetical question that sets forth all of the claimant's impairments. *Walker v. Bowen, supra at* 50-51. "[I]t is difficult to see how a vocational expert can be of any assistance if he is not familiar with the particular Claimant's impairments and abilities-presumably, he must study the evidence of record to reach the necessary level of familiarity." *Id.* at 51. While questions posed to the vocational expert must fairly set out all of the claimant's impairments, the question need only reflect those impairments supported by the record. *See Chrupcala v. Heckler,* 829 F.2d 1269, 1276 (3rd Cir. 1987). Finally, the

hypothetical question may omit non-severe impairments, but must include those that the ALJ finds to be severe. *Benenate v. Schweiker,* 719 F.2d 291, 292 (8th Cir. 1983).

In the present case, the ALJ correctly consulted with a vocational expert to determine the existence of available jobs in the national economy. Unfortunately, the hypothetical questions posed to the vocational expert did not constitute a fair representation of all of Claimant's severe impairments.  In particular, the hypothetical questions did not contain the psychological limitations described by Dr. Bartee or the nonexertional restrictions noted by Dr. Reddy and Dr. Alexander. The ALJ clearly intended to include the functional limitations identified by the agency experts, stating that "hypothetical question number two closely matches the claimant's physical and psychological residual functional capacity and I assign it significant weight."  (Tr. at 22).  However, even that question failed to mention Claimant's significant function-by-function limitations, such as her difficulties with social functioning, her inability to follow detailed instructions, her manipulative limitations, her postural limitations and her environmental limitations as set forth in the physical and psychological residual functional capacity assessments expressly adopted by the ALJ.  The vocational expert plainly grappled with the second hypothetical question, as phrased, because it did not provide a translation of the term "moderate" into concrete functional terms.   The exchange went as follows:

ALJ:   Okay.  So a full range of sedentary work.  I want you to assume, and what I'm going to do from a psychological basis and make it more severe as we go along, I want you to assume that she pain [sic] in her back, her legs, and her feet, sometimes in her hands.  That she takes medication that sometimes makes her drowsy, upsets her stomach, things like that.  Now she doesn't sleep well and she

has some fatigue.  And then she had depression and she gets headaches from time to time.  But any combination of these would cause only a mild reduction in concentration, persistence, and pace.  Are there any jobs, including past relevant work, that an individual so defined could perform?  If there are would [sic] list up to three jobs in the local and national economies.

VE:   Your honor, this profile would preclude all past work.  Jobs would not preclude other positions at sedentary. . .

ALJ:   All right.

VE:   . . . such as machine tender positions.  In the region (inaudible) from the state of Ohio, about 600 positions at sedentary.

ALJ:   Okay.

VE:   Nationally about 80, 000.

ALJ:   All right.

VE:   Also, at sedentary a range of unskilled (inaudible) primarily (inaudible) and organizing documents.

ALJ:   Okay.

VE:   In the region at least 4000 positions and nationally at least 90,000.  Another possibility would be product inspector positions.  In the region about 450 positions at sedentary.  Also consistent with this profile. . . .(inaudible).  On national level this same position totals at least 75,000 at sedentary.

ALJ:   Are these three of many, or just three jobs?

VE:   Your honor, it's three of many in the category involving sedentary work (inaudible).

ALJ: All right.  Let's go to the second hypothetical.  Let's assume in the hypothetical number [sic] is correct, but she would have a moderate reduction in concentration, persistence, pace, doing any—due to any combination of her pain or medications, her headaches, fatigue, or depression, et cetera.  Would any of the jobs listed in the first hypothetical remain?

VE:   Your honor, in my classification I don't believe it actually precludes the performance of this work *depending upon the frequency and duration of moderate (inaudible) symptoms, symptomatology (inaudible).*   (emphasis added).

(Tr. at 43-44).

Obviously, the vocational expert's opinion was tentative and admittedly subject to modification depending upon the nature and duration of Claimant's symptoms.  Moreover, although the ALJ included some of the limitations related to Claimant's severe psychiatric impairments (concentration, persistence, and pace), he left out other significant ones (memory, understanding, social functioning).  Also absent from the hypothetical questions were Claimant's restrictions related to environmental hazards, ability to reach and grasp, manipulative and postural limitations.  The Court is simply unable to conclude from the record that the vocational expert was cognizant of these additional limitations and specific restrictions and took them into account when identifying job categories available to Claimant.[5]  Inasmuch as the ALJ's decision is not supported by substantial evidence, the Commissioner's final determination cannot be affirmed.

**VIII.   <u>Conclusion</u>**

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS NOT** supported by substantial evidence. Accordingly, by Judgment Order entered this day, the final decision of the Commissioner is **REVERSED**, this matter is **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings, and the case is **DISMISSED** from the docket of this Court.

---

[5] The Court also is unable to determine whether the vocational expert's testimony is consistent with the Dictionary of Occupational Titles, because the ALJ failed to make this inquiry as required by SSR 00-4p.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:**  January 25, 2011.

Cheryl A.  Eifert
United States Magistrate Judge